548 So.2d 771 (1989)
WUESTHOFF MEMORIAL HOSPITAL, Appellant,
v.
James B. HURLBERT, Appellee.
No. 89-200.
District Court of Appeal of Florida, First District.
August 31, 1989.
Robert A. Wohn, Jr., of Wohn and McKinley, Cocoa, for appellant.
Gary F. Large, Titusville, for appellee.
BARFIELD, Judge.
We affirm the deputy commissioner's finding that the claimant's injury from Hepatitis B infection was compensable. We find that the "occupational disease" test is applicable in this case, that the deputy commissioner's findings regarding proof of the elements of that test are supported by competent substantial evidence, and that those elements do not require proof of a specific incident of exposure to the Hepatitis B virus.
The claimant was employed in the labs of Wuesthoff Memorial Hospital for three years before he contracted the disease. During the last two years he worked in the outpatient lab, drawing blood and collecting specimens from patients, and processing blood samples from doctors' offices and companies in the area. He handled up to 400 blood specimens per day, many of which would leak or spill. He wore gloves about 50% of the time.
In late October 1987, his dog bit his thumb, breaking the thumbnail and puncturing the skin beneath. In early January 1988, he became ill and was referred by the hospital to Dr. Lane, who diagnosed Hepatitis B. The hospital controverted his claim for workers' compensation benefits, which specified the date of the accident as approximately October or November 1987. It maintained that there was no accident arising out of and in the course of the employment, *772 and no causal connection between the disability and the employment.
The claimant denied any exposure to Hepatitis B through sexual contact, needle sticks, intravenous injection or contact with members of his household (who tested negative for the virus). He stated that he spilled blood every day on his hands while his thumbnail wound was open, and that he handled blood samples of patients who obviously had hepatitis. He was not able to point to any specific incident in which he came in contact with fluid or blood serum that contained Hepatitis B, but felt that his work at the lab was the most logical place for him to have contracted the virus.
William Inman, the health services supervisor for the Brevard County Health Department, had interviewed the claimant to determine the source of his hepatitis and to prevent its spread. In a letter to the director of employee health, Inman stated that "after intensely interviewing Mr. Hurlbert my conclusion as to source of this infection, is his current employment at Wuesthoff Hospital," noting that "this position can expose someone to blood on a regular basis" and that he felt "very comfortable" with his conclusion.
Inman, who was presented to the deputy commissioner as an expert in the field of public health, testified that in his opinion the claimant contracted the Hepatitis B during his employment with the hospital. While he readily admitted that he could not give an absolute answer, he stated that he was talking about a "probable incident, highly, you know, probable incident." He relied upon the facts that his interview eliminated any other sources of the virus and the incubation period (1-6 months, primarily 1-2 months) corresponded to the period between the dog bite and the onset of symptoms, and upon information from the weekly report of the Center for Disease Control (CDC), which was accepted in evidence and established that health care workers are at greater risk of acquiring hepatitis because of their exposure to blood products. Inman stated that about 15% of the Hepatitis B cases in Brevard County are health care work-related and that according to the CDC, 20-30% of the health care workers who deal with blood will develop Hepatitis B.
Dr. Lane testified that in his opinion the claimant contracted Hepatitis B from his employment, although he candidly acknowledged that it was impossible to point to a specific incident in this type of situation and that he could not state unequivocally that the thumb wound was the source of exposure.[1] He explained "there's a strong likelihood," considering that he took an extensive history from the claimant which eliminated sexual contact and intravenous drug use as sources of the virus, and that he had carefully examined the claimant's body for needle pricks. He noted that lab personnel "are probably the most likely in the medical sphere or world to develop Hepatitis B inadvertently through handling of blood components or whatever."[2]
In his order, the deputy commissioner found that the claimant contracted Hepatitis B "while in the course and scope of his employment," relying upon the CDC report and the testimony of the claimant, Inman *773 and Dr. Lane. He found that the claimant's illness was consistent with the incubation period of a Hepatitis B exposure in November 1987 and that the claimant's testimony "showed a sequence of events leading to a contamination with the Hepatitis B virus and there is substantial competent evidence to prove a causal relationship between his work activities and this condition, which I find to be compensable."
Apparently relying on the "occupational disease" theory, the deputy commissioner found that the claimant's condition was actually caused by the employment conditions (handling of blood samples) peculiar to his occupation, that Hepatitis B was actually contracted during his employment, that the occupation of a health care worker presents a particular hazard of Hepatitis B, and that the incidence of the disease is substantially higher in health care workers than in other occupations and in the general public. He acknowledged that the evidence established that no specific incident was identifiable, but rejected this defense, finding that all the evidence indicated the claimant contracted the Hepatitis B virus in the laboratory where he worked.
The issue of causation presented in this case is really a question of whether the injury is one "arising out of" the employment. This phrase has been given several interpretations, but most courts have interpreted "arising out of" to require a showing that the injury was caused by an increased risk to which the claimant, as distinct from the general public, was subjected by his employment.[3] Risks distinctly associated with the employment include "occupational diseases" which are produced by the particular substances or conditions inherent in the environment of the employment. Such risks fall readily within the increased-risk test and are considered work-connected in all jurisdictions. Larson, The Law of Workmen's Compensation § 7 et seq.
Section 440.151(1)(a), Florida Statutes (1987), provides that disablement or death from an "occupational disease" is compensable if the disease is one which "has resulted from the nature of the employment in which the employee was engaged under such employer and was actually contracted while so engaged." The section defines "nature of the employment" as meaning "that to the occupation in which the employee was so engaged there is attached a particular hazard of such disease that distinguishes it from the usual run of occupations, or the incidence of such disease is substantially higher in the occupation in which the employee was so engaged than in the usual run of occupations." Section 440.151(2) further defines "occupational disease" as one "which is due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation, process, or employment," excluding "all ordinary diseases of life to which the general public is exposed, unless the incidence of the disease is substantially higher in the particular trade, occupation, process, or employment than for the general public."
We find that competent substantial evidence supports the deputy commissioner's factual findings which establish each of the elements required for entitlement to compensation under the occupational disease theory, as set out in Broward Industrial Plating, Inc. v. Weiby, 394 So.2d 1117, 1119 (Fla. 1st DCA 1981):
1) the disease must be actually caused by employment conditions that are characteristic of and peculiar to a particular occupation;[4]
2) the disease must be actually contracted during employment in the particular occupation;[5]
3) the occupation must present a particular hazard of the disease occurring so as to distinguish that occupation from usual occupations, or the incidence of the disease must be substantially higher in the occupation than in usual occupations;[6] and
4) if the disease is an ordinary disease of life, the incidence of such a disease must be substantially higher in the particular occupation than in the general public.[7]
*774 In arguing that the occupational disease test should not have been applied in this case and that the evidence fails to show a clear causal connection between the claimant's contraction of Hepatitis B and his employment because he cannot point to any specific incident in which he was exposed to Hepatitis B virus, appellant erroneously relies on cases in which all of the elements of the occupational disease test were not proven, and a causal connection between the disease and the employment was not otherwise proven.[8] A specific incident of exposure *775 need not be proven if, as in the case at issue, all the elements of the occupational disease test have been proven.
Appellant misinterprets the proofs required under the occupational disease test when it argues that even under that test, the findings that the Hepatitis B was "actually caused by employment conditions" and was "actually contracted during employment" are unsubstantiated by the evidence. Assuming the "increased hazard/incidence" elements of the occupational disease test have been proven in such a case, the first two elements of the test do not require proof of a specific exposure to the Hepatitis B virus, but only establishment of a causal connection between the disease and the type of occupation in which the claimant was employed during the specific period of time in which he contracted the disease.
AFFIRMED.
SHIVERS, C.J., and SMITH, J., concur.
NOTES
[1] The doctor was apparently not familiar with deposition terminology. When asked whether he had "an opinion within a reasonable degree of medical probability as to the cause of the Hepatitis B that you observed in Mr. Hurlbert," he responded, "I would guess that he contracted it from the lab." When reminded that he had been asked the question "within a reasonable degree of medical probability," but had used the word "guess," he responded: "Okay. I can't do that. I would say he did acquire it through the lab." The context of this response and the subsequent description of how he arrived at this conclusion indicate that Dr. Lane's "I can't do that" meant that he understood he could not use the word "guess" in a deposition, and that he must state his opinion in terms of probabilities. The deputy commissioner specifically found that the doctor's opinion was within a reasonable degree of medical probability.
[2] In a "To Whom It May Concern" letter, Dr. Lane had outlined the evidence in the claimant's case and noted that his conversation with Inman regarding epidemiological determination of infectious disease "reveals no other possible source other than the handling of blood in the Out-Patient Lab of Wuesthoff Hospital. It is well documented that this aspect of medical care has the highest prevalence of accidental HBV infection."
[3] A substantial number of jurisdictions have modified this interpretation to accept a showing that the risk, even if common to the public, was actually a risk of the employment. A growing group of jurisdictions has adopted the positional-risk test, under which an injury is compensable if it would not have happened but for the fact that the conditions or obligations of the employment put the claimant in the position where he was injured. Larson, The Law of Workmen's Compensation § 6 et seq.
[4] Hepatitis B is caused by exposure to the virus in body fluids, including blood products. The conditions peculiar to the claimant's particular occupation include exposure to blood samples, some of which contain the Hepatitis B virus.
[5] The claimant contracted the disease during the period of time he was employed in the hospital laboratory.
[6] The incidence of Hepatitis B is substantially higher in the claimant's occupation than in usual occupations.
[7] The incidence of Hepatitis B is substantially higher in the claimant's occupation than in the general public.
[8] In Harris v. Josephs of Greater Miami, Inc., 122 So.2d 561 (Fla. 1960), the claimant, a beauty parlor operator, developed dermatitis. The treating physician, an internist, testified that in his opinion it was "possibly or probably" caused by dyes or some other substance used in her work, but he made no tests to determine the actual cause of the disease, leaving that to the "skin man." Patch tests using the suspected substances were inconclusive and the dermatologist thought the skin condition was not due to occupational exposures. Another doctor stated he did not know what caused the condition. The court rejected application of the "logical cause" doctrine (which creates a presumption of causation to justify a finding of compensability where an employee is found injured in the course of his employment, but the cause of the accident is not able to be determined), stating that in cases involving diseases or physical defects of an employee, as distinguished from external occurrences such as an automobile accident, "there must be some clear evidence other than speculation or conjecture establishing a causal connection between a Claimant's injury and her employment."

In Hillsborough County School Board v. Bigos, 396 So.2d 848 (Fla. 1st DCA 1981), the finding of compensability for infectious hepatitis was reversed because the record failed to show a causal connection between the hepatitis and the claimant/teacher's employment (the doctor could not say whether the claimant contracted the disease from her student, or vice versa, or they both got it from someone else).
In Lake v. Irwin Yacht & Marine Corporation, 398 So.2d 902 (Fla. 1st DCA 1981), the claimant sought compensation for chronic bronchitis under either an exposure or occupational diseasetheory (inhaling toxic fumes). Tests established the bronchitis, but not the cause of the disease. Three doctors testified that chemical exposure was the most likely cause, and there was no medical evidence that claimant's exposure to chemicals was not causally related to her bronchitis. The court distinguished Harris on the medical testimony in that case, and found that a causal relationship was established in Lake by competent, subjective and deductive diagnosis. It noted the overlap between exposure and occupational disease theories, and found that the elements of exposure theory were proven, but that the claimant had failed to prove that her occupation presented a particular hazard of the disease occurring or that the incidence of the disease was substantially higher than in other occupations.
In Department of Corrections v. Lussier, 451 So.2d 968 (Fla. 1st DCA 1984), the finding of compensability was reversed for lack of proof of a causal connection between the employment and the disease (no medical evidence that the patient treated by the claimant/dentist suffered from the particular form of hepatitis he contracted).
In City of Miami v. Wilson, 453 So.2d 1165 (Fla. 1st DCA 1984), rev. den., Wilson v. City of Miami, 461 So.2d 116 (Fla. 1985), a finding of compensability for mononucleosis was reversed, the court finding no evidence that the patient whom the claimant/paramedic was treating when he sustained a needle stick either had mononucleosis or was a carrier.
City of Tamarac v. Varellan, 463 So.2d 479 (Fla. 1st DCA 1985) the deputy commissioner's determination that the claimant contracted Hepatitis B while swimming in an algae-laden swimming pool during police academy training was reversed, the court finding that there was no evidence that the swimming pool was contaminated with Hepatitis B virus.
In City of Fort Lauderdale v. Lindie, 496 So.2d 168 (Fla. 1st DCA 1986), rev. den., Lindie v. City of Fort Lauderdale, 506 So.2d 1042 (Fla. 1987), the deputy commissioner found that the claimant's Herpes Symplex I arose from a compensable accident (the claimant had rendered aid to an injured victim and was covered with the victim's blood and body fluids; the victim had multiple lacerations, a runny nose, and sores in the corners of his mouth; the claimant had sustained a small cut on her left hand which was exposed during the time she was rendering aid to the victim). The court found no competent substantial evidence that the claimant contracted herpes from the injured pedestrian and ruled that there must be clear evidence, rather than conjecture or speculation, to establish the causal connection between the disease and the employment.